Freddie EUBANKS, Petitioner,

v.

**WARDEN, LOUISIANA STATE PENI-TENTIARY, Respondent.**

Misc. No. 748.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

April 30, 1964.

Sam Monk Zelden, Bruce J. Borrello, Zelden & Zelden, New Orleans, La., for petitioner.

Jack P. F. Gremillion, Atty. Gen., for the State of Louisiana.

M. E. Culligan, Asst. Atty. Gen., John E. Jackson, Jr., Asst. Atty. Gen., Baton Rouge, La., for respondent.

WEST, District Judge.

This case is before the Court on the application of petitioner, Freddie Eubanks, sometimes herein referred to as "defendant", for the issuance of a writ of habeas corpus. Eubanks was convicted of murder in connection with the slaying of Mrs. Mabel Clarkson in May of 1954. His conviction was appealed through the State Courts of Louisiana,

after which certiorari was granted by the United States Supreme Court, 355 U.S. 812, 78 S.Ct. 68, 2 L.Ed.2d 30; 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991. Upon review by that Court, the conviction was set aside on the grounds that there had been a systematic exclusion of Negroes from the grand jury in Orleans Parish, Louisiana, which had indicted him, and the State of Louisiana was ordered to grant him a new trial. Pursuant to this mandate, a new trial was granted, and on September 25, 1959, petitioner was again found guilty as charged. On December 21, 1959, the Court ordered the death sentence imposed.

During the course of this second trial, an alleged confession was offered and introduced into evidence over the objection of counsel for defendant. The objection was based upon the contention that the defendant was mentally incapable of giving or understanding a confession; that the confession was obtained in violation of due process of law required by the Fifth and Fourteenth Amendments to the Constitution of the United States; and that under the circumstances surrounding the giving of this confession, the confession could not be considered as having been freely and voluntarily given by the defendant. Evidence as to the admissibility of the confession was heard by the trial judge who ruled that the State had successfully carried the burden as to the voluntariness of the alleged statement, and that thus it was admissible in evidence. A bill of exception was properly reserved, and an appeal ultimately taken based upon this, and other bills reserved. Upon appeal, the Supreme Court of the State of Louisiana affirmed the conviction and sentence.

After the affirmance of the sentence and conviction by the Louisiana Supreme Court, 240 La. 552, 124 So.2d 543, a date was set for defendant's execution. This Court, upon defendant's application for the issuance of a writ of habeas corpus, issued an order staying the execution and ordering respondents to show cause why the writ should not issue as prayed for. A hearing was held before this Court, at which time the Court heard arguments of counsel. Defense counsel informed the Court during argument that he could produce no additional evidence in support of his contentions, and agreed to submit the matter on the entire record of this case as it now stands. The Court requested and was furnished a complete transcript of the trial proceedings, consisting of three volumes of testimony.

While recognizing the fact that a reversal by this Court of a State Court conviction for want of due process involves a delicate exercise of power, nevertheless, after minute and detailed study of the transcript of the record in this case, I am constrained to hold that the confession used against this accused during his trial was obtained by the State in violation of the fundamental notions of fairness required by the due process clause of the Fourteenth Amendment. In support of this conclusion, a résumé of the testimony contained in the transcript of the record of this case is in order.

Mrs. Mabel Clarkson, about 70 years of age, was found dead in her room in New Orleans at about 5:05 p. m. on Tuesday, May 25, 1954. Mrs. Clarkson's room was located on the third floor above La Louisiane Restaurant in New Orleans. The defendant, Freddie Eubanks, a fifteen year old colored youth, who was employed by La Louisiane Restaurant as a clean up boy, was arrested at about 4:30 p. m. on Saturday, May 29, 1954. He was taken to the Parish jail and locked up. He was not interrogated at that time. He remained there the rest of the day, Saturday, all Saturday night, all day Sunday, Sunday night, and until about 4:00 p. m. on Monday, May 31, 1954, when interrogation commenced. He was interrogated intensely by several policemen who took turns questioning him from 4:00 p. m. until 9:00 or 9:30 p. m. that night. During that five or five and one-half hour period, bit by bit the officers obtained what they considered to be a satisfactory oral confession from this defendant. Then, during the next two or

two and one-half hours, the officers pieced these bits together and typed out what they considered to be the substance of the oral confession which they had thus obtained. Some time between 11:00 and 11:30 p. m. that night, or more than seven hours after the interrogation commenced, after apparently reading the final product back to the defendant, who could neither read nor write, the defendant placed an "X" mark on each page of the "confession."

It is undisputed that at no time during the two days of his incarceration prior to interrogation, nor during the five hours of interrogation, nor during the two hours of preparation of the written confession, was the defendant ever told that he had or might have either state or federally protected rights which he might voluntarily waive or which he might refuse to waive, nor was any attempt ever made to notify a parent, attorney, or any adult friend of this boy's predicament so that he might have mature, adult counsel if he so desired. On the other hand, there is no evidence in the record that the accused was actually beaten, intimidated, or threatened, nor is there any evidence that he was made any promises in return for his alleged confession. But the record does contain much evidence concerning the mental capacity, or lack of mental capacity, of this defendant. The record is replete with evidence that this fifteen year old colored boy was mentally defective, and that he had mental capabilities far below those of an average person of his age. During the trial, testimony concerning the mental condition of this boy was heard from three psychiatrists, one psychologist, and one general practitioner, the latter being the Coroner of Orleans Parish at that time. In view of the testimony of these doctors, it is somewhat difficult for this Court to understand how a person such as this defendant could have been allowed to stand trial, much less have his confession, obtained as it was, used against him during his trial.

This defendant was born in a small town in Mississippi approximately fifteen years prior to the time of his arrest. He did not remember ever having known his father, and just vaguely remembered his mother, and thought that she was engaged in domestic servant work. At one time he had left home and had gone to Chicago, Illinois, where, he stated, he was promptly arrested and placed in jail, apparently for vagrancy. However, he stated that he did not know the reason for his arrest. He was released and came to New Orleans, Louisiana, where, after a week or two, he obtained two jobs as porter or clean up boy. He worked at Gluck's Restaurant from 1:00 a. m. to 7:00 a. m., and then went to work each day at La Louisiane Restaurant from 7:00 a. m. to 5:00 p. m. He had no home in New Orleans, and "slept each night wherever night caught him." Apparently the only friends he had were possibly some of the colored people with whom he worked, and, it would be presumed, the owners or managers of the establishments for which he worked. It was not until after the alleged confession had been obtained from the defendant, and after he had affixed his "X" mark to this alleged confession, that he was, for the remainder of the proceedings, represented by counsel. Who obtained counsel for him at that late date is not readily apparent from the record. As soon as counsel undertook the defense of this defendant, they applied to the Court for the appointment of a lunacy commission to examine the defendant, it being their contention, as stated in their application for the appointment of a lunacy commission that the defendant "was not sane at the time of the commission of the alleged offense," and that the defendant "has been and is still insane and mentally defective to the extent that he is unable to understand the proceedings against him, or to assist his counsel in his defense, and that the said defendant was, at the time of the commission of the alleged crime, and is now, legally insane and legally irresponsible for his actions and conduct." As a result of this application, the Court appointed Dr. C. S. Holbrook, a qualified

psychiatrist, to serve with the Coroner, Dr. Nicholas Chetta, as members of a lunacy commission to examine the defendant and to report their findings to the Court. The lunacy commission, composed of these two doctors, examined the defendant extensively, and ultimately, in some respects, disagreed in their findings. Dr. Holbrook, who was a qualified psychiatrist, concluded that this defendant had an unusually low I.Q. and was "feeble-minded". Because of this feeling, he requested that Psychometric examinations be performed. After seeing the results of these examinations, which will be discussed later, Dr. Holbrook concluded that the defendant was entirely illiterate and completely devoid of anything that speaks for education. He concluded that the defendant was a feeble-minded individual of extreme degree, and he placed him in the imbecile group. He concluded that the defendant had a mental age of between six and seven years, and that he could only tell right from wrong as a child of six or seven years of age. It was his further conclusion that this defendant was "readily suggestible, hypersuggestible," and that he could be led into doing almost anything. He stated that this defendant would probably do just about as he was told to do and that he did not know enough to keep out of trouble. As previously stated, the other member making up the lunacy commission at this time was Dr. Nicholas Chetta, Coroner of the Parish of Orleans. Dr. Chetta is not a psychiatrist, but is instead a general medical practitioner. He disagreed with Dr. Holbrook in that he, Dr. Chetta, felt that the defendant was a moron instead of an imbecile, and it was his belief that the defendant was malingering, in spite of the fact that the Psychometric reports definitely indicated otherwise. In his conclusions, Dr. Chetta simply ignored completely the results of the Psychometric examinations administered by Dr. Irving A. Fosberg. He did agree, however, that the defendant had an I.Q. of only 40 to 45, and he concluded that the defendant had a mental capacity of a child of five years of age, and he did agree that the defendant was "not capable of defending himself," and that he "would answer commands and do what he is told, and nothing more." In spite of these admissions on the part of Dr. Chetta, it was still his stated opinion that this defendant was mentally capable of freely and voluntarily giving a confession, and was mentally able to stand trial. This lunacy commission reported their difference of opinion to the Court, whereupon the Court appointed a third member to the lunacy commission. This third appointment was Dr. N. Tharp Posey, a qualified neuro-psychiatrist. The testimony of Dr. Posey leaves much to be desired. He does not in any way even attempt to refute the fact that this defendant had an I. Q. of between 40 and 45, and that he had the mental capacity of a child of four to seven years of age. He readily admits that the defendant is "an uneducated, low grade moron", but he concludes that in his opinion the defendant was malingering, and therefore he concurred in the opinion of Dr. Chetta. As a result of this concurrence, Dr. Posey and Dr. Chetta, as the majority of the lunacy commission, rendered a report to the Court in which they concluded that the defendant, Freddie Eubanks, "is at the present time able to appreciate the usual, natural and probable consequences of his acts; that he is able to distinguish right from wrong; that he is able to assist his counsellor; and that he is at the present time sane." Apparently as a result of this majority report of the lunacy commission, the Court ruled that the defendant was sane for the purpose of standing trial.

The Psychometric tests administered to the defendant by Dr. Irving A. Fosberg consisted of a Wechsler Bellevue intelligence test, a Rorschach test, and a D. A. P. test. The Wexler test showed the defendant to have an I. Q. of 49, which Dr. Fosberg classified as the intelligence of a "feeble-minded" person. Because of the fact that Dr. Fosberg had been told that the defendant might be malingering, the Rorschach test was ad-

ministered. Dr. Fosberg testified that the result of the Rorschach test confirmed the finding of feeble-mindedness, and completely refuted the claim of malingering. In order to determine the mental age of the defendant, the D. A. P. test was administered. This test, according to Dr. Fosberg, indicated that the defendant had a mental age of four and one-half years. Dr. Fosberg, when testifying, concluded that this defendant was completely unable to take care of himself in his own best interest. He further concluded that there was no evidence whatsoever of malingering on the part of this defendant, even though he did believe that during the trial of the case the defendant, in many instances, lied. He further concluded that the defendant could distinguish right from wrong only as could a child of four years of age.

Later on, and before trial, defense counsel had the defendant examined by Dr. Edward G. Long, a psychiatrist. This doctor concluded that the defendant had an I. Q. of between 40 and 45, and that he had a mental age of six to six and one-half years. He classified the defendant as an imbecile, and one who was mentally defective to a rather severe degree. It was his conclusion that the defendant would, in all probability, try to please when asked to do something, which he stated was characteristic of many mental defectives. He, too, thought that the defendant lied during the trial, but he did not believe that the defendant was in any way a malingerer. He stated that the defendant merely acted as a child. In other words, he concluded that the defendant would try to figure out what people wanted him to say or do, and then he would say or do it in order to please. It was his further opinion, while observing the defendant during the trial, that this defendant did not "pick up over 20 to 30 per cent of what goes on in Court."

Thus, we have the medical picture of this defendant. Every doctor who testified classified him as either a moron or an imbecile. They all agreed that he had an I. Q. of 40 to 45. All agreed that he had a mental age of from four to seven years. This is the picture of the child whom we are asked to hold voluntarily confessed to the crime of murder and voluntarily and knowingly waived whatever constitutional rights are accorded him by the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

When this case was reviewed on appeal by the Supreme Court of Louisiana, 240 La. 552, 124 So.2d 543, the Court, in the course of its opinion, said:

"It is not seriously contended here that in offering this confession the State did not meet the requirements of our Constitution and Code of Criminal Procedure by establishing that the confession was freely and voluntarily given and was not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. * * * Counsel for the appellant now argue that the accused did not have the mental capacity to make such a confession, that he did not know the difference between right and wrong at the time it was made, and that he is ignorant, is an imbecile, and did not realize the import of his actions. In other words, counsel now argue that at the time the confession was given, the accused was insane. We do not think the record supports this contention. Even if we concede, however, that the evidence tends to show that the accused was of a low mentality and possibly feeble-minded, such mental deficiency would not of itself render the confession inadmissible but rather is a matter that bears on the weight, credibility, and effect to be given to the confession by the jury."

I do not believe the question involved here is whether or not the defendant was "insane" when he gave his so-called "voluntary confession," nor do I believe that the question now involved narrows down to whether or not the State, in offering the confession in evidence during the trial met the requirements of the Con-

stitution of the State of Louisiana and those of the Louisiana Code of Criminal Procedure. It is simply not enough to merely say that the criminal proceedings against a defendant met all of the requirements of the Constitution and laws of the State. They must also have met the requirements of the Constitution of the United States of America. From the evidence in this case, I must conclude that the proceedings in connection with the obtaining and using of the defendant's confession did not satisfactorily meet those requirements.

There have been many cases decided by the United States Supreme Court pertaining to the admissibility of confessions, but two cases, I believe, are particularly in point.

In the case of Haley v. State of Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), a fifteen year old boy was accused of murder. For five hours, from midnight to 5:00 a. m., he was questioned by police taking turns. The defendant, during these five hours of interrogation, had no friend or counsel present. At about 5:00 o'clock in the morning, after being shown an alleged confession of two other boys, he confessed. At no time was he advised of his right to counsel, but the confession, which was in question and answer form, started out with a statement advising him of his rights and asking if he still wanted to make the statement. He answered in the affirmative. In that case, the defendant was jailed right after the confession was signed. He was held incommunicado for three days. His mother was not allowed to see him for five days. The trial court instructed the jury to disregard the confession if they found that it was not voluntarily given. Upon review, in the course of its opinion, the United States Supreme Court said:

"But the ruling of the trial court and the finding of the jury on the voluntary character of the confession do not foreclose the independent examination which it is our duty to make here. Ashcraft v. State of Tennessee, 322 U.S. 143, 147, 148,

64 S.Ct. 921, 923, 88 L.Ed. 1192. If the undisputed evidence suggests that force or coercion was used to exact the confession, we will not permit the judgment of conviction to stand even though without the confession there might have been sufficient evidence for submission to the jury. Malinski v. People of State of New York, supra, 324 U.S. [401] at page 404, 65 S.Ct. [781] at page 783, 89 L.Ed. 1029, and cases cited."

The Court went on to say:

"We do not think the methods used in obtaining this confession can be squared with that due process of law which the Fourteenth Amendment commands.

" * * * [W]hen, as here, a mere child—an easy victim of the law— is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. * * * A 15-year old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition. * * * But we cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. * * *"

The Court then noted that no lawyer or friend was allowed to stand by his side to make sure that the police went so far, and no farther, to see that they stopped short of the point where he became a victim of coercion. The State, in that case, contended that it was only after the defendant had confessed that he was held incommunicado, and that thus, his contention that his subsequent detention without adult counsel was violative of due process of law was not germane. The Court disagreed, saying:

" * * * But they show such a callous attitude of the police towards the safeguards which respect for ordinary standards of human rela-

tionships compels that we take with a grain of salt their present apologia that the five-hour grilling of this boy was conducted in a fair and dispassionate manner. * * *

"The age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights combine to convince us that this was a confession wrung from a child by means which the law should not sanction. Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law."

The Court in that case concluded that under the totality of circumstances, the boy there involved could not understand, much less waive, his constitutional rights.

In Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), the defendant was a fourteen year old boy. He, together with others, apparently beat and robbed a man who later died of the beating. The defendant in that case was arrested on January 1, 1959. His mother attempted to see him on January 2, 1959, at 11:30 p. m., and was informed that visiting hours were 7:00 to 8:00 p. m. She made no effort to see him again until January 8, 1959. On January 1, 1959, when arrested, the defendant's brother voluntarily confessed, and at that time, the defendant admitted that he had a part in the crime. They were taken to Juvenile Hall, and the next day, January 2, 1959, he was examined by the police in Juvenile Hall where he gave a confession. The day that he was arrested, on January 1, 1959, his mother had been contacted by the police and advised of her son's right to have counsel. No counsel was obtained for the boy. The boy was then tried and convicted. Upon review by the United States Supreme Court, the conviction was set aside. The Court held that confessions obtained by "secret inquisitorial processes are suspect * * *." The

Court found, as a fact, that there was no prolonged questioning in this case, but they held that the five day detention, during which time no lawyer was summoned for the boy, and during which time the boy had no adult advice, gave the case an "ominous cast." The Court stated:

"The prosecution says that the boy was advised of his right to counsel, but that he did not ask either for a lawyer or for his parents. But a 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights."

In the Gallegos case, the State argued that the confession was not wrung from the boy, but that it "came tumbling out." But the Court said that a boy of fourteen years could have no way to know the consequences of what he was saying. Without some adult protection, a fourteen year old boy would not be able to know, let alone assert, such constitutional rights as he had.

The Court concluded:

"There is no guide to the decision of cases such as this, except the totality of circumstances that bear on the two factors we have mentioned. The youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, the failure to see to it that he had the advice of a lawyer or a friend—all these combine to make us conclude that the formal confession on which this conviction may have rested * * * was obtained in violation of due process."

■■ This Court is not attempting at this time to hold that in no instance could the confession of a fourteen or fifteen year old boy be properly obtained and properly admitted into evidence. We are holding that each case must be determined in light of its own facts and circumstances, and that it is only by an examination of the totality of circumstances that we can determine whether or not the fundamental concepts of fairness required by the due process clause of the Fourteenth Amendment have been adhered to in obtaining such a confession. Whether or not a confession has been obtained by coercion is not a matter of mathematical determination. Nor, in order to show that a confession has been freely and voluntarily given, is it sufficient to merely show that the defendant has not been threatened or beaten in order to obtain it. The totality of circumstances must show that the confession was obtained freely and voluntarily, with due regard to the fundamental concepts of fairness required by law.

I must conclude that this case presents a far stronger case for reversal than did either Haley or Gallegos. At least in those two cases the defendants were treated as juveniles. In those two cases the defendants were normal children of fourteen and fifteen years of age. In the instant case, the defendant, Freddie Eubanks, was a mental defective, of the imbecile class, with a mental age of somewhere between four and seven years. He was arrested as an adult, was interrogated as an adult, and was treated as an adult without any apparent consideration being given to either the tender age of the defendant or to his mental deficiency. It is readily admitted that no effort was made to contact a parent, a friend, or an attorney who could stand by this child's side to be certain that his rights were protected. Certainly, when a confession is obtained under these conditions, we are not justified in concluding that such a confession was "freely and voluntarily" given. The circumstances, by their very nature, preclude a finding that a deliberate and responsible choice was exercised by this boy in giving a so-called confession, bit by bit, during a five hour period of interrogation. This Court, as always, is extremely reluctant to interfere with the orderly administration of criminal justice in the State Courts. And this Court is particularly reluctant to attempt to throw road blocks into the path of police officers which will prevent or hamper them in the vitally important investigative work necessary for efficient crime prevention and detection. However, the ends of justice have not been met by merely apprehending and ultimately convicting a law violator. The apprehension and ultimate conviction must be brought about with due regard to all of the constitutional rights guaranteed to every defendant by the Constitution of the United States and the various amendments thereto. The abolition of one constitutional safeguard today will certainly precipitate the abolition of others tomorrow. This we must guard against with all the facilities at our command. The Court is not unmindful of the fact that this defendant has been tried twice, before two different juries, and in both instances has been found guilty as charged. Nor is the Court unmindful of the trouble and expense that such a reversal visits upon the State. But be that as it may, it is not within the province of this Court to determine guilt or innocence when considering an application for the issuance of a writ of habeas corpus. It is only the function of this Court to determine whether or not the conviction of a defendant was brought about in a manner consonant with the provisions of the Constitution of the United States, and to determine further whether or not all of the rights guaranteed by that Constitution have been properly accorded to the defendant. After a careful study of the record in this case, I come to the inescapable conclusion that this defendant was not dealt with as required by the due process clause of the Fourteenth Amendment to the United States Constitution. The conviction and sentence must therefore be set aside. This does not, of course, mean that this

defendant must go free. The State will have a reasonable time within which to re-try this defendant should it elect to do so. But in the event such a new trial is not accorded to the defendant within six (6) months from the time the judgment rendered herein becomes final, the writ of habeas corpus applied for will then be granted and it will then be necessary, in accordance herewith, for the defendant to be released. Judgment will be rendered accordingly.